**UNITED STATES DISTRICT COURT FOR THE**
**EASTERN DISTRICT OF VIRGINIA**
**(Alexandria Division)**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:20-cr-00010-LO-1** |
| | ) | **The Honorable Liam O'Grady** |
| | ) | **Sentencing Hearing:  July 21, 2020** |
| **CHARLES O'NEIL,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## CHARLES O'NEIL'S MEMORANDUM IN AID OF SENTENCING

On July 21, 2020, Charles O'Neil will appear before the Court for sentencing.  Mr. O'Neil, by and through his undersigned counsel, respectfully submits this memorandum to aid the Court in determining an appropriate sentence in this case.[1]

## I.    INTRODUCTION

On January 23, 2020, pursuant to a written agreement, Mr. O'Neil entered a plea of guilty before this Court to a criminal Information charging him with one count of Conspiracy to Make Conduit Contributions, in violation of 18 U.S.C. § 371.[2]

It cannot be disputed that Mr. O'Neil committed a crime.  Neither counsel nor Mr. O'Neil offer any excuse for his criminal wrongdoing.  For almost three years, however, the gravity of this matter has weighed heavily on him, both emotionally and physically.  He has recognized the seriousness of this matter since May of 2017, when FBI agents executed a search warrant at his place of employment and interviewed him.

---

[1] Pursuant to Local Criminal Rule 47(C) of the Local Rules of the United States District Court for the Eastern District of Virginia and Rule 49.1 of the Federal Rules of Criminal Procedure, all personal identifiers in the support letters attached as Exhibit 1 have been redacted.

[2] This offense carries a statutory maximum of five years imprisonment, a fine no greater than $250,000, a $100 special assessment and a supervised release term of not more than three years.

Mr. O'Neil's history and characteristics (as reflected in the many testaments set forth in the attached support letters), his high risk of contracting COVID-19 if he is incarcerated, and his role in relation to other defendants in this case, leads to the clear conclusion, we respectfully submit, that a sentence of probation would promote respect for the law, afford adequate deterrence, and would, most importantly, represent a just punishment.

## II.   <u>LEGAL STANDARD</u>

Section 3553 of Title 18 of the United States Code is the statutory basis of the Federal sentencing structure.   Section 3553(a) requires sentencing courts "<u>to impose a sentence sufficient, but not greater than necessary</u>, to comply with the purposes set forth" in the Sentencing Reform Act of 1984 ("SRA" or "Sentencing Reform Act") (emphasis added).  Those purposes are:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

18 U.S.C. § 3553(a)(2) (emphasis added).

In determining the sentence minimally sufficient to comply with Section 3553(a)(2), the sentencing court must consider several factors listed in Section 3553(a).  These are:  (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) "the kinds of sentences available"; (3) the Guidelines and policy statements issued by the Sentencing Commission, including the Guidelines range; (4) "the need to avoid unwarranted sentencing disparity among defendants with similar records who have been found guilty of

similar conduct"; and (5) "the need to provide restitution to any victims of the offense."   18 U.S.C. § 3553(a)(1), (a)(3)-(a)(7).

In *United States v. Booker,* 543 U.S. 220, 226-27 (2005), the Supreme Court ruled that the Sixth Amendment, as interpreted by the Court's decision in *Blakely v. Washington*, 542 U.S. 296 (2004), mandates that the Guidelines can no longer operate as mandatory sentencing rules. The *Booker* Court held that two provisions of the Sentencing Reform Act, 18 U.S.C. § 3553(b)(1) (the provision of the federal sentencing statute that requires sentencing courts to impose a sentence within the applicable Guidelines range, absent a basis for departure) and 18 U.S.C. § 3742(e) (the provision that establishes standards for appellate review), must be severed and excised.  *Booker,* 543 U.S. 220 at 259.

Thus, after *Booker*, the Guidelines have only advisory force.  *United States v. Hughes,* 401 F.3d 540, 546-47 (4th Cir. 2005).  Subsequent cases decided by the Supreme Court have affirmed the authority of the district courts to sentence defendants within the range of choice dictated by the facts and circumstances of the case before the Court.  In *Rita v. United States*, 551 U.S. 338, 351 (2007), the Supreme Court made clear that a district court may consider arguments that "the Guidelines sentence itself fails to properly reflect [18 U.S.C.] § 3553(a)'s considerations."  While the Court must give respectful consideration to the Guidelines in determining a sufficient sentence, *Gall v. United States,* 552 U.S. 38, 49-50 (2007), it may not presume that a Guidelines sentence is a correct one.  *Rita,* 551 U.S. at 351.  *See also Kimbrough v. United States,* 552 U.S. 85, 101 (2007) (noting that sentencing courts may vary from the advisory Guidelines range based solely on policy considerations, including disagreement with the policy underlying the Guidelines in a case.).  The "Guidelines are not only *not mandatory* on

sentencing courts; they are also not to be *presumed* reasonable." *Nelson v. United States*, 555 U.S. 350, 352 (2009) (per curiam) (emphasis in original).

The result of this change in the Federal sentencing scheme is that district courts may "take account of" the advisory Guidelines range as part of all the sentencing goals and factors enumerated in 18 U.S.C. § 3553(a), but are no longer bound by the sentencing range indicated by the applicable range in the case. *Cunningham v. California,* 549 U.S. 270, 286 (2007). The advisory Guidelines are, therefore, only "the starting point and the initial benchmark" in determining a sentence and not the only consideration. *Gall,* 552 U.S. at 49. Sentencing judges "must make an individualized assessment based on the facts presented," and must "consider sentences other than imprisonment." *Id.* at 50, 59.

## III.   **DISCUSSION**

In accordance with the direction provided by the Supreme Court in *Gall* and the Fourth Circuit in *Hughes*[3] we will first address the appropriate Guidelines range, recognizing, again, that the Supreme Court has made clear that a district court may not presume that a Guidelines sentence is substantively reasonable. *Rita*, 551 U.S. at 351. We will then discuss the remaining sentencing factors set forth in § 3553(a). After examining the facts in this case and applying all

---

[3] In *Hughes*, the Fourth Circuit set forth the requirements with which district courts must meet, as follows:

> In the wake of *Booker* . . . the discretion of a sentencing court is no longer bound by the range prescribed by the guidelines. Nevertheless, a sentencing court is still required to "consult [the] Guidelines and take them into account when sentencing." Consistent with the remedial scheme set forth in *Booker*, a district court shall first calculate (after making the appropriate findings of fact) the range prescribed by the guidelines. Then, the court shall consider that range as well as other relevant factors set forth in the guidelines and those factors set forth in [18 U.S.C.] § 3553(a) before imposing the sentence. If the court imposes a sentence outside the guideline range, it should explain its reasons for doing so.

*Hughes*, 401 F.3d at 546.

of the Section 3553(a) factors, we ask the Court to impose a sentence of probation.  Such a sentence is no greater than necessary to achieve the goals of the SRA.

A.      **Guidelines Range (18 U.S.C. § 3553(a)(4) & (a)(5)).**

Prior to any sentencing enhancements, the United States Probation Officer ("USPO") calculates Mr. O'Neil's base offense level at eight.   *See* Charles O'Neil Presentence Investigation Report ("PSR") at ¶ 44.  The USPO proposes that the offense level be increased by four levels, under USSG § 2B1.1(b)(1)(I), because the loss amount exceeds $15,000.  *Id.* at ¶ 45.  The USPO proposes a three-level adjustment under USSG § 3B1.1(b).  *Id.* at ¶ 47.  The USPO submits the adjusted offense level is fifteen, with a Criminal History Category I.  *Id.* at ¶¶ 49, 62 & 63.[4]  Given that the proposed offense level is less than 16, Mr. O'Neil receives only a two-level decrease for acceptance of responsibility.  *Id.* at ¶ 51. The total offense level, according to the USPO, is 13. *Id.* at ¶ 52.

We disagree.  An upward adjustment is not warranted under § 3B1.1.  Under the terms of the plea agreement, the government "reserves the right to argue that pursuant to U.S.S.G. § 3B1.1(b), there is a 4-level increase in the offense level because the defendant was an organizer or leader and the criminal activity involved five or more participants or was otherwise extensive."  *See* Dkt. No. 7, at 3.[5]  It is the government's burden to demonstrate by a preponderance of the evidence that an enhancement under § 3B1.1 is warranted.  *United States v. Steefen*, 741 F.3d 411, 414 (4th Cir. 2013).  For the reasons set forth below, the government

---

[4] "[A] district court may weigh a defendant's lack of a criminal record, even when the defendant has been placed into a criminal history category I, in its § 3553(a) analysis."  *United States v. Huckins*, 529 F.3d 1312, 1319 (10th Cir. 2008).

[5] As set forth below, U.S.S.G. §3B1.1(b) allows for a three-level, not a four-level increase.  This is of no moment, however, as Mr. O'Neil does not qualify any enhancement.

cannot show that Mr. O'Neil held an aggravating role in the criminal activity described in the statement of the offense.

Section 3B1.1 of the Sentencing Guidelines provides for increases in a defendant's offense level based upon a defendant's aggravating role in the offense as follows:

> (a) If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels.
>
> (b) If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels.
>
> (c) If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by 2 levels.

U.S.S.G. § 3B1.1. Application note 2 states: "To qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants." *See* USSG §3B1.1, cmt. n. 2.

The government has not shown by a preponderance of the evidence that Mr. O'Neil supervised anyone. *See United States v. DeGovanni*, 104 F.3d 43, 44 (3d Cir.1997) ("one is only a 'supervisor' under U.S.S.G. § 3B1.1(c) when he is so involved in, and connected to, the illegal activity of others that he actually supervises their illegal conduct, and is not just a supervisor by virtue of his de jure position in the police department hierarchy"); *see also United States v. Fuentes*, 954 F.2d 151, 153 (3d Cir.), cert. denied 504 U.S. 977 (1992) (holding that sentences should not be enhanced under § 3B1.1(b) unless the defendant supervised or managed the actions of another individual in the criminal enterprise ); *United States v. Belletiere*, 971 F.2d 961, 969-70 (3d Cir. 1992) (concluding that § 3B1.1 enhancements apply to supervision of others in group activities). The fact that Mr. O'Neil held the title of "Vice President" does not render an enhancement under § 3B1.1 applicable. *See* U.S.S.G. § 3B1.1, cmt. 4 (explaining that "title . . . [is] not controlling" in determining whether an enhancement is proper under § 3B1.1). This

adjustment does not apply to a defendant who "exercise[s] management responsibility over the property, assets, or activities of a criminal organization." *United States v. Cameron*, 573 F.3d 179, 184 (4th Cir. 2009) (internal citations omitted). "That is because an adjustment under § 3B1.1 is proper 'only . . . if it [is] demonstrated that [a defendant] was an organizer, leader, manager or supervisor of *people*." *Id.* at 185 (quoting *Sayles*, 296 F.3d at 226) (emphasis in original).

In determining whether a defendant held a leadership or organizational role, the Court should consider seven factors. *United States v. Sayles*, 296 F.3d 219, 224 (4th Cir. 2002) (citing U.S.S.G. § 3B1.1, cmt. n. 4). These include:

> "[1] the exercise of decision making authority, [2] the nature of participation in the commission of the offense, [3] the recruitment of accomplices, [4] the claimed right to a larger share of the fruits of the crime, [5] the degree of participation in planning or organizing the offense, [6] the nature and scope of the illegal activity, and [7] the degree of control and authority exercised over others."

*Id.* (quoting U.S.S.G. § 3B1.1, cmt. n. 4). In *Sayles*, the defendants were convicted of drug and firearm offenses. *Sayles*, 296 F.3d at 220. Officers observed one of the defendants, Smith, selling drugs to others. *Id.* at 221. He was stopped after he drove away, and police found money, digital scales and residue inside the car and a bag, which was tossed outside the care by a passenger, containing about four grams of crack cocaine. *Id.* Sayles was videotaped holding money and a large amount of what appeared to be crack cocaine. *Id.* He was later stopped in car with a gun, digital scales, a pistol and about four grams of crack cocaine. *Id.* At trial, witnesses testified that they bought large amounts of drugs from, and sold drugs to Smith and Sayles. *Id.* An expert testified that digital scales were used by drug dealers, not drug users. *Id.*

The presentence investigation report recommended that a four-level adjustment for Smith, because, in part, he organized and led two distributors. *Id.* at 225. At sentencing, the

district court found Smith to be an organizer or leader and applied a four-level enhancement.  *Id.* at 222.  The probation officer also recommended a four-level adjustment for Sayles, because he had at least three sources of supply for crack cocaine, he converted cocaine powder to crack and a witness testified that he sold drugs for Sayles "on approximately 20 occasions."  *Id.* at 225.  The district court applied a two-level enhancement to Sayles, because he was a "lesser player in the conspiracy."  *Id.*

The Fourth Circuit reversed and remanded the case, ruling that "being a buyer and seller of illegal drugs, even in league with five or more other persons, does not establish that a defendant has functioned as an 'organizer, leader, manager or supervisor' of criminal activity."  *Id.* (internal citations omitted).  The court of appeals noted that government introduced no evidence that Smith or Sayles "exercise[d] decision making authority," "plan[ned] and organize[d]" the criminal activity or "exercise[d] … control and authority over others" in the criminal activity.  *Id.* (citations omitted).  On appeal, the government argued that it presented evidence below proving two relevant aggravating role factors as to Smith and one as to Sayles, namely that they both "recruited" drug couriers and Smith retained a "larger share" of the drug proceeds.  *Id.* at 226. The Fourth Circuit rejected this argument, stating:  "Such evidence could provide the basis for a § 3B1.1 adjustment only if it demonstrated that Sayles was an organizer, leader, manager or supervisor of *people*."  *Id.* (emphasis in original).

In *Cameron,* following his conviction for uttering counterfeited obligations of the United States, the defendant argued that the district court erred in applying a four-level leadership enhancement.  *United States v. Cameron*, 573 F.3d 179, 184 (4th Cir. 2009).  There, the government urged the United States Court of Appeals for the Fourth Circuit to defer to the district court's judgement because of "Cameron's integral role as the manufacturer of the bills

effectively gave him the authority to control the flow of the bills to the other participants." *Id.* at 185. This argument, according to the Court of Appeals, "misse[d] the mark, because it conflate[d] the *potential* to exercise control over an operation with the *actual* exercise of control." *Id.* (internal citation omitted and emphasis in the original).

"[T]he primary goal in applying § 3B1.1 should be to make a 'commonsense judgment about the defendant's relative culpability given his status in the criminal hierarchy.'" *United States v. House*, 883 F.3d 720, 724 (7th Cir. 2018) (quoting *United States v. Dade*, 787 F.3d 1165, 1167 (7th Cir. 2015)). Mr. O'Neil was at the bottom of the hierarchy. Mr. O'Neil did not exercise decision-making authority. Kelley Rogers was the decision-maker, and Mr. O'Neil acted at the direction of Rogers. PSR at ¶¶ 26, 28, 29 and 32. The nature of Mr. O'Neil's participation in the commission of the offense was minor, as compared to other participants. The individual identified in Paragraph 14 of the PSR consulted with Rogers, *not* Mr. O'Neil, about how to spend the money that Conservative StrikeForce collected from donors. PSR at ¶ 14. Scott Mackenzie "worked closely with Rogers regarding Conservative StrikeForce's finances and filed disclosures with the FEC on Conservative StrikeForce's behalf." PSR at ¶ 15. There is no evidence that Mr. O'Neil interacted with Candidate 1, Committee 1, Person A or Company A. PSR at ¶¶ 16-18. Mr. O'Neil recruited his girlfriend. He recruited no other accomplices. Mr. O'Neil claimed no right to a larger share of the fruits of the crime. Mr. O'Neil's degree of participation in planning or organizing the offense was less than the persons identified above. Finally, Mr. O'Neil did not exercise control over others. Therefore, an aggravating role adjustment does not apply here.[6]

---

[6] Because the government has not shown that Mr. O'Neil supervised anyone, the Court need not decide if this offense was "otherwise extensive." U.S.S.G. § 3B1.1. Notwithstanding, this was not a complex scheme and, therefore, it was not "otherwise extensive." *See United States v. Beverly*, 284 F. App'x 36, 41-42 (4th Cir. 2008) ("In determining whether criminal activity is 'otherwise extensive,'

The Court should reject the USPO's recommendation for a three-level enhancement under § 3B1.1. Instead, the Court should apply a mitigating role adjustment. Under the terms of the plea agreement, Mr. O'Neil "reserves the right to argue that pursuant to USSG § 3B1.2(b) . . . a 2-level decrease [is appropriate] . . . because [Mr. O'Neil] was a minor participant in any criminal activity." PSR at ¶ 3. "The determination whether to apply subsection (a) or subsection (b), or an intermediate adjustment, is based on the totality of the circumstances and involves a determination that is heavily dependent upon the facts of the particular case." U.S.S.G. § 3B1.2, cmt. n. 3(C). "The fact that a defendant performs an essential or indispensable role in the criminal activity is not determinative. Such a defendant may receive an adjustment under this guideline if he or she is substantially less culpable than the average participant in the criminal activity." *Id.* Among other factors, the Court should consider "the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority . . . ." *Id.* The record shows by a preponderance of the evidence that Rogers was the decision-maker, and that Mr. O'Neil followed his instructions.[7]

For these reasons, the Court should apply a mitigating role adjustment of two levels. This would result in a total offense level of eight, with a corresponding Guidelines range of 0 to 6 months.

---

many reviewing courts have examined the "totality of the circumstances, including not only the number of participants but also the width, breadth, scope, complexity, and duration of the scheme.").

[7] Indeed, in his letter to the Court, Kelley Rogers states that Mr. O'Neil's "involvement in this matter was due to him following and implementing [Mr. Rogers'] explicit instructions." *See* Exhibit 1, at 22 (Letter from Kelley Rogers). Mr. Rogers goes on to state: "Chip acted, at all times, under my instruction and direction in the matter before [the Court] today." *Id.*

### B.      Mr. O'Neil's History and Personal Characteristics Support a Sentence of Probation.

Mr. O'Neil acknowledges and fully understands that he committed a serious offense. Other than the conduct at issue here and the offense for which Mr. O'Neil has accepted responsibility, however, Mr. O'Neil has led an ethical, hard-working, and honest life.  The numerous letters of support from Mr. O'Neil's family, friends, and colleagues make clear that Mr. O'Neil is a decent, compassionate man, who has made taking care of others his priority in life.  When this Court considers Mr. O'Neil's history and characteristics with his misconduct here, we respectfully submit that a just sentence is probation.

Mr. O'Neil is 33 years old, and is the son of Ann Mathais O'Neil and Brian Hoen O'Neil of Baltimore, Maryland.  *See* Exhibit 1, at 1 (Letter from Ann Mathias O'Neil); Exhibit 1, at 2 (Letter from Brian Hoen O'Neil).  Mr. O'Neil's mother, Ann, is a teacher at Roland Park Country School in Baltimore, Maryland, and his father, Brian, has been a financial advisor with Merrill Lynch for 40 years.  *Id.*  Mr. O'Neil suffered a traumatic loss when he was nine years old and his maternal grandparents were brutally murdered, and suffered once again at age twenty, when one of his lifelong friends suddenly passed away.  *See* Exhibit 1, at 1 (Letter from Ann Mathias O'Neil).  Mr. O'Neil was "supported by many friends and family through these difficult times," and, as a result, Mr. O'Neil's family is "very close."  *Id.*

The closeness of Mr. O'Neil's family is plain in the letters from his parents, sister, brother-in-law, and cousin.  Mr. O'Neil's sister, Sara Moore, is a registered nurse in Delaware. *See* Exhibit 1, at 3 (Letter from Sara T. Moore).  Ms. Moore describes Mr. O'Neil not only as her brother, but as "one of [her] best friends."  *Id.*  In her letter to the Court, Ms. Moore describes the love and care Mr. O'Neil has shown her and her infant daughter:

> I could go on for pages with stories as to why [I tell anyone and everyone that Chip is my best friend], he constantly supports me, stands up for me, and guides me, and we go to each other for advice. Nevertheless, the "Chip Story" that sticks with me the most is the one that is still unfolding. It began just over a year ago with the birth of my daughter, [A.R.]. My brother's already big heart immediately grew, he truly fell in love with her. He is the absolute proudest Uncle I have ever seen. From day 1, Chip has taken on the Uncle roll effortlessly. Prior to having [A.], I spoke with Chip once a week, we live about 2 hours apart and lead our own lives. Since her birth, we speak with him over the phone or FaceTime at least 5-6 days a week, sometimes even multiple times a day. There are even times when he will call, and when I tell him that [A.] is napping he asks me to call him back when she wakes just because he wants to see her. For Christmas and her 1st birthday, he couldn't wait to give her the presents he bought for her, on both occasions, he gave her the gifts early out of pure excitement. He is always doing things to try to make an otherwise very serious toddler smile. He succeeds one hundred percent of the time, in turn, making us all smile. It warms my heart to see my daughter's new two-tooth smile and hear her giggle when she sees his face. There are even times if I am having difficulty with a toddler tantrum, I call Chip and she instantly calms upon hearing his voice. As a first-time mother, I depend on him for some sanity.

*Id.* Mr. O'Neil's brother-in-law, Randy Moore, echoes Sara's sentiments. Mr. Moore, who served in the United States Marine Corps for eight years, and currently works as a Journeyman Lineman for Delmarva Power, describes Mr. O'Neil as "liv[ing] up to a code of his own making." *See* Exhibit 1, at 4 (Letter from Randy S. Moore). Mr. Moore observed how Mr. O'Neil's friends "acted with nothing but respect not only towards [Mr. O'Neil's] sister but anyone he brought into his circle. It wasn't a respect commanded by force or by superior intellect or athletic ability but by character." *Id.* Mr. Moore goes on to describe Mr. O'Neil's gentle and loving character in his letter to the Court:

> When I talk about Chip's ethos, one of the many qualities that stand out, especially since my daughter was born is his deep care for others. I saw this toward Sara when we were dating and got married  What really showed me how much he cares for others was when my daughter was born. Chip calls everyday just to talk to [A.]. He comes to visit her more than any of his friends. He take the time to teach her how to hold a lacrosse stick, even if she forgets a minute later. He will sit and play with her until she has to go to sleep, even if it's the most repetitive thing she can think of. There is nothing he wouldn't do to make [A.] safe and healthy, to me that means the world.

*Id.* Mr. O'Neil's love and compassionate extends beyond his immediate family.  Kevin O'Neil,

Mr. O'Neil's cousin, describes Mr. O'Neil as a "fun, hard-working, and genuine person." *See*

Exhibit 1, at 5 (Letter from Kevin O'Neil).  In his letter to the Court, Kevin describes his

relationship with Mr. O'Neil:

> Chip was my older cousin growing up, so naturally I always looked up to him.
> He was always very funny, energetic and a joyful person at our family outings.
> He was the oldest of all of our cousins, and taught us the importance of family
> and taking care of those you loved.  He was always extremely close with our
> Grandmother, who we lost just a few years ago, and through that relationship you
> could see his genuine and caring personality and how much he values family and
> his loved ones.

*Id.*  Kevin "can confidently say that Chip will always support [him] and [his] family no matter

what life throws at us, because that is the kind of person he is." *Id.*  Kevin states that Mr. O'Neil

is "compassionate, caring and extremely trustworthy." *Id.*  Kevin states that he "can't even tell

[the Court] how much [Mr. O'Neil] means to myself and to our entire extended family." *Id.*

Mr. O'Neil's family understands the gravity of Mr. O'Neil's offense, and also

understands that Mr. O'Neil has taken full responsibility for his conduct.  Mr. O'Neil's mother

states that these circumstances have "brought him great humility with the ability to move

forward from this experience and learn from his mistakes." *See* Exhibit 1, at 1 (Letter from Ann

Mathias O'Neil).  Mr. O'Neil's father tells the Court that Mr. O'Neil has "absolutely taken

responsibility for his actions [, and] has grown and understands the consequences of his actions."

*See* Exhibit 1, at 2 (Letter from Brian Hoen O'Neil).  Mr. O'Neil's sister, Sara, writes of how

Mr. O'Neil has been especially ashamed of the effects his actions have had on his family:

> I can tell you that Chip is extremely remorseful for his transgression.  Throughout
> this ordeal, he has been his biggest critic, and it breaks my heart to see this.  I
> know he is disappointed in himself for what he has done and for bringing this
> hardship to our family and others.  I strongly believe this experience has changed

my brother for the better.  Chip has a good heart and the sweetest soul, which reflects on the way he treats his entire family and anyone he comes across.

*See* Exhibit 1, at 3 (Letter from Sara T. Moore).  Randy Moore shares his similar experience with

Mr. O'Neil's remorse over his actions in this case:

> When all this started to come out, I didn't know much about what had happened, but I saw how much Chip beat himself up over it.  When I talked to Chip to help calm him down, I learned that he was concerned about how this would affect his family.  He was worried that when [A.] was old enough she would look at her uncle as being a bad person.  What I saw was that Chip, like myself, would beat himself up worse than anybody else could over doing something wrong . . . . All I can say is Chip knows he was wrong and made a huge mistake, it is a burden he will carry with him for the rest of his life.

*See* Exhibit 1, at 4 (Letter from Randy S. Moore).

Mr. O'Neil attended high school at The Boys' Latin School of Maryland, and went on to graduate from Franklin and Marshall College.  *See* Exhibit 1, at 1 (Letter from Ann Mathias O'Neil); Exhibit 1, at 2 (Letter from Brian Hoen O'Neil).  Mr. O'Neil was a "three-sport athlete throughout his four years of high school [and] received the Jack Williams Cup for sportsmanship from The Boys' Latin School of Maryland his senior year."  *See* Exhibit 1, at 1 (Letter from Ann Mathias O'Neil).  During his high school and college years, Mr. O'Neil formed deep and lasting bonds with several individuals, who now write to the Court with their support.  Andrew Sullivan describes Mr. O'Neil as his "lifelong friend" and states that Mr. O'Neil is his "brother – not by birth, but by choice."  *See* Exhibit 1, at 7 (Letter from Andrew J. Sullivan).  Mr. Sullivan's "fondest memories of [his] childhood are those [he] share[s] with Chip and his family."  *Id.*  Mr. O'Neil "will always be [Mr. Sullivan's] first call when [he] need[s] help or when [he] need[s] perspective."  *Id.*  Mr. Sullivan summarizes his relationship with Mr. O'Neil and his high opinion of Mr. O'Neil's character for the Court as follows:

> He is my oldest friend, and he would drop everything for me – as I would for him. His character, in my eyes, speaks for itself and is a testament to his parents and the community that raised him.
>
> . . . . Chip isn't malicious.  He isn't calculated or conniving.  Rather, Chip is a sweet, simple guy who wants to please those around him, who wants to fit in, and who wants people to like him.  Chip is endlessly selfless – often to a fault.  He puts others ahead of himself, even if it's to his own detriment.

*Id.*  Mr. Sullivan asks for leniency for Mr. O'Neil and is "absolutely certain that Chip has learned a tremendous amount from this experience, and [he] know[s] without a shade of doubt that he will never be found in a position similar to this again." *Id.*

Taylor Paff has been a close friend of Mr. O'Neil's for "more than 20 years." *See* Exhibit 1, at 8 (Letter from Taylor Paff).  Mr. O'Neil and Mr. Paff grew up playing lacrosse together, and formed a strong bond during their high school years at Boys' Latin. *Id.*  As high school classmates, Mr. Paff was "able to gain an understanding of Chip's character and integrity." *Id.*  He states that Mr. O'Neil "quietly lead by example as [they] navigated [their] way as young men.  He has a stoic presence with unwavering morals.  Chip was someone many have counted on for honesty and integrity." *Id.*  Mr. Paff knows Mr. O'Neil as being "consistently himself" and "unapologetically honest," and asks for leniency for his lifelong friend." *Id.*

Michael Hurwitz met Mr. O'Neil the summer before his freshman year of high school, and describes Mr. O'Neil as his "best friend." *See* Exhibit 1, at 9 (Letter from Michael Hurwitz). Mr. Hurwitz had transferred to Boys' Latin from a different lower and middle school, and recalls how Mr. O'Neil made him feel like he belonged and "not like an outsider," by inviting him to lunch and back to his family's home between lacrosse practices. *Id.*  Mr. O'Neil and his "family [have made Mr. Hurwitz] feel so welcome in so many ways and [he] truly cherish[es his] relationship with them." *Id.*  Mr. O'Neil was a groomsman in Mr. Hurwitz's wedding and "is

one of the first calls [Mr. Hurwitz] makes when [he has] something good or bad to share." *Id.*

Mr. Hurwitz shares a difficult time he went through, and how Mr. O'Neil provided him with

emotional support in his letter to the Court:

> Unfortunately, this year I went through a difficult time with the loss of my
> grandmother.  During this tough time of grief, it was comforting to see Chip and
> his mother, Ann, at the funeral showing their full support and love.  We are
> Jewish so it is customary to start sitting Shiva right after the funeral.  Chip asked
> if my family needed anything and for my grandparents' address, so he could stop
> by.  Chip being a good Catholic boy was not sure what he was getting into but
> seeing him one of the seven nights was exactly what I needed and just another
> example of how giving and great of a friend I have in Chip . . . . Chip is much
> more than a friend to me; his is my family.

*Id.* at 10.

Mr. O'Neil met Justin Rayman in 2006, during Mr. Rayman's "first day on campus as a

freshman at [Franklin & Marshall College]."  *See* Exhibit 1, at 11 (Letter from Justin Rayman).

Although Mr. O'Neil was one year older and had attended a rival high school in Baltimore, Mr.

Rayman states that Mr. O'Neil "took [him] under his wing and [they] immediately became best

friends."  *Id.*  Mr. O'Neil's "kindness and acceptance made [Mr. Rayman's] transition to life at

school seamless – something [he] value[s] and [has] not forgotten."  *Id.*  Mr. O'Neil and Mr.

Rayman became very close during their undergraduate years, and spent "the time around

Christmas with each other's family."  *Id.*  Mr. Rayman states that "Chip's rare combination of

humility and genuineness make him extremely likeable and a valued friend to so many people."

*Id.* at 12.  Mr. Rayman describes Mr. O'Neil as "extremely loyal," "one of the most selfless

people [he has] met," and as someone who "values family, friendship and genuinely enjoys

doing things for others."  *Id.*  To Mr. Rayman, Mr. O'Neil is "the donor of kind acts on a daily

basis."  *Id.* at 13.

Mr. Rayman also describes Mr. O'Neil's dedication towards Franklin & Marshall's lacrosse team, despite the fact that he did not spend an incredible amount of time on the field during games:

> Chip is also an extremely dedicated person, which is obvious to anyone who has met him.  At F&M, Chip did not garner much playing time throughout his career but he never let that deter his work ethic and obligations to the team.  He showed up to practice early, no complaints and gave maximum effort.  We frequently held 6:00 AM runs and workouts; Chip was always on time, ready to work knowing he would not likely be rewarded with playing time.  Other teammates in Chip's situation coasted through practice, goofed-off and broke rules designed for the betterment of the team – not even a consideration for Chip . . . . This carried a lot of weight for myself and other teammates and speaks volumes about his dedication to those inside the locker room.  Every day, Chip sacrificed his personal college experience to contribute to an experience that was bigger than himself.  I strongly believe the way Chip carried himself as a teammate strengthened our relationship and his relationships with his peers.

*Id.* at 12.  Mr. Rayman asks the Court to take Mr. O'Neil's past into consideration and to grant him leniency in sentencing.  *Id.* at 3.

Scott Hahn was also on Franklin & Marshall's lacrosse team with Mr. O'Neil.  *See* Exhibit 1, at 14 (Letter from Scott G. Hahn).  As a close friend of Mr. O'Neil's for over thirteen years, Mr. Hahn describes Mr. O'Neil as "selfless, which is why [he is] begging for leniency in his sentencing."  *Id.*  Just as he did with Mr. Rayman, Mr. O'Neil took Mr. Hahn provided immediate support and made him feel welcome during his time at Franklin & Marshall:

> I first met Chip in August 2007 as an incoming Freshman on the Franklin and Marshall men's lacrosse team.  As the lone freshman on the team hailing from Baltimore, I was struggling to find my place.  Although I am two years younger, Chip provided me with the guidance that helped me solidify my true identity at Franklin and Marshall College.  Whether it was providing a quiet place to sleep the night before a big game or offering to give me a ride to the grocery store due to a lack of transportation, he has always exemplified what it takes to be a leader by putting the needs of others before those of himself.  Chip is the friend who cancels his Friday evening plans so he can pick me up from the airport after a business trip.  Chip is the friend who goes out of his way to see my country band play in endless empty venues.  He has always been there for his friends and family.

*Id.*

Todd Cavallaro met Mr. O'Neil in 2008, when Mr. Cavallaro became the Head Lacrosse Coach at Franklin & Marshall College.   *See* Exhibit 1, at 15 (Letter from Todd B. Cavallaro). Although Mr. Cavallaro has "coached many young men over the last 25 years," he describes Mr. O'Neil as "one of the best individuals [he has] come across."   *Id.*   Mr. Cavallaro describes his recollections as his time as Mr. O'Neil's coach and their ongoing relationship in his letter to the Court:

> One of the first things I remember thinking about Chip was how genuine and sincere he was as a junior in college.  He was well respected by his teammates and administrators throughout his 4 years at F&M.  He is trustworthy and well-liked by all.  I know him to be loyal, respected, professional, and enjoyable to just be around.  F&M lacrosse is not just a four year commitment but a lifetime commitment.  Chip has continued to communicate with his teammates and coaches throughout the years after graduation.  We always enjoy catching up and talking about our families.
>
> Our core value within our program is "FAMILY," a Chip as much as anyone appreciates family and has a tremendous amount of support from his family and his F&M Family as well.  Chip went from a player of mine to a great friend, a loyal person, and someone who is committed to being successful in the game of life.  He is intelligent, sharp, respected by his peers, and will make all of us proud given the opportunity.

*Id.*  Although Mr. O'Neil did not "play a lot or start for us . . . he showed up everyday working hard, being a leader, and encouraging his teammates to be their best."   Id.   These qualities "speak[] volumes to [Mr. O'Neil's] character and integrity [and] earned him the respect of all of his teammates and certainly his coach."   *Id.*   Mr. Cavallaro closes his letter by asking for "leniency in sentencing Chip, as [he] know[s] he will make all of us proud in the future through his work ethic, loyalty, and his strong commitment to family."   *Id.*

Lacrosse has continued to play a large role in Mr. O'Neil's life.  After college, Mr. O'Neil and Michael Hurwitz returned to Washington, D.C., where they spent four years

coaching a youth travel lacrosse team.   *See* Exhibit 1, at 9 (Letter from Michael Hurwitz). During their coaching years, Mr. Hurwitz "witnessed how nurturing, mild mannered and committed Chip was with every child on the team and how the kids loved being around him." *Id.*  Mr. O'Neil's father fondly recalls that "[o]n more than one occasion away from the field, [he and] Chip . . . would run into a young player who would call him 'Coach' and both would smile brightly."  *See* Exhibit 1, at 2 (Letter from Brian Hoen O'Neil).  Indeed, Christopher Frederick, a West Point graduate, former military officer, combat veteran, and old friend of the O'Neil family who has known Mr. O'Neil for twenty years also recounts how Mr. O'Neil "has volunteered his time for many years to coach youth lacrosse and pass along his knowledge and experience to children in Maryland."   *See* Exhibit 1, at 16 (Letter from Christopher N. Frederick).   Mr. Frederick describes Mr. O'Neil as a "good man [who] has always strived to do good things."  *Id.*

Elizabeth Gormley and her family have been good friends with Mr. O'Neil and his family for "as long as [she] can remember," and she considers Mr. O'Neil "one of [her] closest friends." *See* Exhibit 1, at 17 (Letter from Elizabeth Gormley).  Through the significant amount of time she has spent with Mr. O'Neil and his family on "vacations, family diners, birthdays and holidays," Ms. Gormley tells the Court that there "is not a more loving and supportive family" than Mr. O'Neil's.  To Ms. Gormley, Mr. O'Neil "resembles all that is good that can come from such a solid family.  He is incredibly kind, supportive and loyal.  Chip is the first person to make contact when there is something to be celebrated and the first when there has been a tragedy." *Id.*  Ms. Gormley understands the gravity of Mr. O'Neil's actions and states the following in her letter to the Court:  "The true character of a person is defined by their response to . . . mistakes and taking accountability.  Chip has taken responsibility and grown from this lapse in judgment, which speaks highly to the man he was raised to be by his parents."  *Id.*

Mr. O'Neil has also forged lasting and meaningful relationships in his professional life. Maryland State Delegate Kathy Szeliga and Mr. O'Neil "have worked together on a variety of projects, issues, and campaigns for about the last five years."  *See* Exhibit 1, at 18 (Letter from Maryland State Delegate Kathy Szeliga).  Delegate Szeliga considers Mr. O'Neil "more than a work colleague, [she] consider[s] him a friend."  *Id.*  Delegate Szeliga describes her opinion of Mr. O'Neil's character and her request for leniency in her letter to the Court:

> Chip has consistently been hardworking and reliable.  I always enjoy working with Chip because he is kind and thoughtful of others.  One of the projects Chip worked on for me was an annual reception held with our governor in Annapolis. For the three years, this event drew more than one hundred people each year and has always been a big success.  Having met Chip's parents on a few occasions, it is clear that Chip comes from a very good family with parents who are supportive and loving.

> As a mom of sons now in their thirties, I have walked with them through numerous trials as they have grown up into responsible adults.  Each one of us has faced adversity and bad decisions, especially in our early years.  As I taught my sons, those may not always define us, but it's how we handle those situations, admit our mistakes, and make changes going forward.  I see Chip growing as a man through this adversity.

> Finally, as a lawmaker I have seen first-hand the benefits of and voted for laws to give second chances for those who have come into contact with the judicial system.

*Id.*  Paul Haughton, Jr. was the "Senior Political Advisor to former Speaker of the House of Virginia Delegates, the Honorable William J. Howell, from 2008 until his retirement in 2017." *See* Exhibit 1, at 19 (Letter from Paul F. Haughton, Jr.).  During his position as Senior Political Advisor, Mr. Haughton worked with Mr. O'Neil.  *Id.*  Mr. Haughton speaks highly of his experiences with Mr. O'Neil in his letter to the Court:

> I have the absolute highest regard, both personally and professionally, and utmost respect for Chip O'Neil.  In all my dealings with him, Chip was honest, always the consummate professional, loyal; and, his ethics and integrity were always beyond reproach; a characteristic that is rare and seldom experienced in the world of political consultants.  Chip was always there when we needed him; and, both

> Speaker Howell and I considered him an integral, honest, and loyal member of
> our team.

*Id.*  Mr. Haughton closes his letter by assuring the Court that Mr. O'Neil's "mistake has certainly

taken a toll of [his] personal and professional life."  *Id.*  Mr. Haughton is "confident that Chip

undoubtedly has realized his wrongdoing and he feels remorse for his actions," and asks for the

Court's leniency in sentencing Mr. O'Neil.  *Id.*

Mr. O'Neil is currently employed by MedChi, the Maryland State Medical Society.  *See*

Exhibit 1, at 20 (Letter from Gene M. Ransom, III).  Gene Ransom, III is the Chief Executive

Officer of MedChi, and is a member of the Maryland Bar.  *Id.*  Mr. Ransom has known Mr.

O'Neil for eight years, and Mr. O'Neil has always "impressed [Mr. Ransom] as a bright, earnest,

committed person who is eager to please."  *Id.*  Mr. Ransom explains his working relationship

with Mr. O'Neil and his complete and total knowledge of this case:

> Mr. O'Neil has been totally honest and transparent with me and his direct
> supervisor at MedChi.  He readily admits his mistake, has accepted responsibility
> and is truly sorry.  I would like Your Honor to know that he has been totally
> transparent with me regarding his behavior and disclosed the relevant facts of his
> misguided conduct to me.
>
> I employed Mr. O'Neil eight months ago with full knowledge of this situation and
> with the firm belief that we all fail and deserve a second chance.  He has made the
> most of his opportunity, performed well and has a long-term future with my
> organization, if Your Honor is inclined to show him mercy and utilize some type
> of alternative punishment other than incarceration.
>
> The personal toll this has taken on his reputation has been great and the end
> results of his actions will be his burden for the foreseeable future.

*Id.* at 20-21.  Mr. Ransom is "confident that [Mr. O'Neil] can lead a productive, full life, as a

good citizen," and does not feel that Mr. O'Neil is a "person who would likely re-offend."  *Id.* at

21.

Although he has been broken by this situation, Mr. O'Neil does not shirk any responsibility for his actions.  In expressing remorse for his behavior, Mr. O'Neil states the following to the Court:

> I write today to express directly to [the Court] my shame, regret and apologies for my actions that have led us to this place.  The burden of my offense never leaves me, and I am just so very sorry.  I have embarrassed myself, my friends and most importantly my family beyond belief.
>
> My hope is [the Court] will extend mercy and allow me to rebuild my life.  My goal is to live a productive, law-abiding life and to do good work in my career ahead whatever that may be.  This process has taught me a lot about the right way to conduct myself and my personal remorse will be a constant reminder for years to come.
>
> I have secured long-term stable employment which is both productive and rewarding.  I am gratified to say that my current employer is well aware of my actions, my remorse for them, and these proceedings.  I will, with [the Court's] mercy, be able to retain an excellent job going forward.  I can assure you that I am most thankful for this.
>
> I have made a mistake and have done something wrong.  I accept responsibility for my actions, and I will assure you that I will not repeat these mistakes.  I will learn, grow, and be a law-abiding citizen.  If given a second chance, I will be a valuable member of the community and will be engaged in doing good work for the remainder of my life.

*See* Exhibit 2 (Letter from Charles H. O'Neil).  The anguish that Mr. O'Neil has suffered throughout the protracted investigation of his misconduct and subsequent conviction is described by the USPO in the Presentence Investigation Report.  *See* PSR, at ¶ 76.

It is clear from the letters from Mr. O'Neil's family, friends, and colleagues that he is a loyal people pleaser, sometimes to a fault.  This is made clear in the letter submitted by Kelley Rogers – Mr. O'Neil's former employer at Strategic Campaign Group.  In his letter to the Court, Mr. Rogers states that Mr. O'Neil's "involvement in this matter was due to him following and implementing [his] explicit instructions."  *See* Exhibit 1, at 22 (Letter from Kelley Rogers).  Mr. Rogers explicitly states:  "Chip acted, at all times, under my instruction and direction in the

matter before [the Court] today." *Id.*  Mr. O'Neil is not attempting to shift blame for his actions. He acknowledges and accepts what he did was wrong.  The explanation provided by Mr. Rogers, however, is critical to the Court's fashioning of a fair and just sentence for Mr. O'Neil.

The outpouring of support from Mr. O'Neil's family, friends, and colleagues reinforces the sentiments shared by Mr. O'Neil himself – he is a man who recognizes his blessings, cares deeply for those he loves, and readily takes responsibility for his actions.  Given Mr. O'Neil's history and personal characteristics, we respectfully submit that a sentence of probation would be a just sentence, while also satisfying the goals of the SRA.

### C.       A Sentence of Probation Complies with the Purposes of the SRA.

Section 3553(a) directs the Court to impose a sentence that is "not greater than necessary" to: (a) reflect the seriousness of the offense; (b) afford adequate deterrence to criminal conduct; (c) protect the public from further crimes of the defendant; and (d) provide correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(2).  Here, each of these factors – just punishment, deterrence, incapacitation, and rehabilitation – would be achieved by a sentence of probation.

### 1.       Just Punishment

A sentence of probation is sufficient – but not greater than necessary – to achieve the goal of just punishment.  In assessing the adequacy of a sentence of probation, we submit the Court should also take into consideration the substantial hardships, both personal and professional, that Mr. O'Neil has faced since being approached by the FBI in May of 2017.

His punishment is already underway and is severe.  Mr. O'Neil's reputation is diminished in the eyes of persons who do not know him well.  Given his felony conviction, his employment prospects are diminished.  Indeed, he will lose his job if he is incarcerated.  *See United States v.*

*Samaras*, 390 F. Supp. 2d 805, 809 (E.D. Wis. 2005) (imposing non-guidelines sentence in part because, as a consequence of his conviction and sentence, defendant lost a good public sector job, a factor not considered by the guidelines).  We expect Mr. O'Neil's current employer, Gene Ransom, will be present at Mr. O'Neil's sentencing hearing, and will represent to the Court that he cannot guarantee that Mr. O'Neil will have a position with MedChi following any period of incarceration.  The prospect of losing his current job and not being able to find another one is unbearable and unnecessary.

These circumstances meet any need for retribution.  The offense for which Mr. O'Neil has been convicted is serious, but a sentence of probation is a meaningful sentence, and is truly a just punishment.

### 2.  <u>Deterrence</u>

A sentence of probation achieves the goal of deterrence.  *See United States v. Yeaman*, 248 F.3d 223, 238 (3d Cir. 2001) (Nygaard, J., dissenting) ("the disutility of being in prison at all [in white collar cases] and the stigma and loss of earning power may depend relatively little on the *length* of imprisonment") (citing A. Mitchell Polinsky & Steven Shavell, <u>On the Disutility and Discounting of Imprisonment and the Theory of Deterrence</u>, 38 J. Legal Stud. 1, 12 (1999)) (emphasis in original).

Research regarding white collar offenders in particular (presumably the most rational of potential offenders) found no difference in the deterrent effect of probation and that of imprisonment.  *See* David Weisburd *et al*., <u>Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes</u>, 33 Criminology 587 (1995); *see also* Zvi D. Gabbay, <u>Exploring the Limits of the Restorative Justice Paradigm:  Restorative Justice and White Collar Crime</u>, 8 Cardozo J. Conflict Resol. 421, 448-49 (2007) ("[T]here is no decisive evidence to

support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders."). The collateral consequences discussed above are sufficient to deter others from committing similar crimes.

Here, a period of probation for one year, coupled with community service, would be most appropriate. A sentence of probation itself is a "substantial restriction of freedom." *Gall*, 552 U.S. at 44 (internal citation omitted). As the Supreme Court has explained: "We recognize that custodial sentences are qualitatively more severe than probationary sentences of equivalent terms. Offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty." *Id.* at 48; *see also United States v. Knights*, 534 U.S. 112, 119 (2001) ("Inherent in the very nature of probation is that probationers 'do not enjoy the absolute liberty to which every citizen is entitled.'") (quoting *Griffin v. Wisconsin*, 483 U.S. 868, 874 (1987)); *United States v. Nesbeth*, 188 F. Supp. 3d 179, 181 (E.D.N.Y. 2016) (explaining that the "collateral consequences of a felony conviction form . . . civil death [or the loss of rights]," and emphasizing that "[c]onvicted felons now suffer restrictions in broad ranging aspects of life that touch upon economic, political, and social rights").

Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. *See* USSG § 5B1.3(c). They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking. *See* USSG § 5B1.3(c). Most probationers are also subject to individual special conditions imposed by the court. *See* USSG § 5B1.3(d).

Mr. O'Neil's earning power is greatly diminished, and he will surely suffer significant financial consequences as a result. Punishment through a prison sentence is not required to provide deterrence in this case.

### 3.      Incapacitation

Section 3553(a)(2) also requires the Court to consider the need to "protect the public from further crimes of the defendant."  No period of incarceration is necessary to protect the public from further crimes of Mr. O'Neil – there is no reason to believe there will be further crimes.  The effect that this case has had on his life and the lives of his family members – absent any period of incarceration – is a sufficient guarantee that he will never commit another offense.

Moreover, as the United States Sentencing Commission has recognized, defendants without any prior contact with the criminal justice system are unlikely to recidivate.  *See* United States Sentencing Commission, Recidivism and the "First Offender," A Component of the Fifteen Year Report on the U.S. Sentencing Commission's Legislative Mandate (May 2004) (offenders with no prior arrests or convictions have the lowest recidivism rate).  In imposing the least sentence sufficient to account for the need to protect the public from further crimes, this Court should consider the statistically low risk of recidivism presented by Mr. O'Neil.  *See, e.g., United States v. Darway*, 255 F. App'x. 68, 73 (6th Cir. 2007) (upholding downward variance on basis of defendant's first-offender status); *United States v. Urbina*, No. 06-CR-336, 2009 WL 565485, at *3 (E.D. Wis. Mar. 5, 2009) (considering low risk of recidivism indicated by defendant's lack of criminal record, positive work history, and strong family ties); *United States v. Cabrera*, 567 F. Supp. 2d 271, 279 (D. Mass. 2008) (granting variance because defendants "with zero criminal history points are less likely to recidivate than all other offenders").

Given the shame Mr. O'Neil feels for having committed this crime, the hardship he has brought to his family, and the fact he is a first-time offender, there is virtually no chance of recidivism in this case.

### 4.     Rehabilitation

A lengthy sentence is not necessary to provide rehabilitation. Where a lengthy prison sentence is not necessary for purposes of rehabilitation, a below-Guidelines sentence is appropriate. *Gall*, 552 U.S. at 57-59. Indeed, district courts, relying on the findings of the United States Sentencing Commission, have recognized that probation is both rehabilitative and punitive:

> Probation is viewed by many as rehabilitative in nature . . . . However, probation is also a punitive measure, and "may be used as an alternative to incarceration, provided that the terms and conditions of probation can be fashioned so as to meet fully the statutory purposes of sentencing, including promoting respect for the law, providing just punishment for the offense, achieving general deterrence, and protecting the public from further crimes by the defendant."

*United States v. Davis*, No. 07 Cr. 727, 2008 WL 2329290, at *6 (S.D.N.Y. June 5, 2008) (quoting *United States v. Brady*, No. 02 Cr. 1043, 2004 WL 86414, *8-9 (E.D.N.Y. Jan. 20, 2004)) (quoting U.S. Sentencing Guidelines Manual ch. 5, pt. B, introductory cmt.).

### D.     A Sentence Other Than Imprisonment is Warranted in This Case.

Section 3553(a)(3) "directs [the sentencing Court] to consider sentences other than imprisonment." *Gall*, 552 U.S. at 59. Since the Guidelines are now advisory, the Sentencing Table and the restrictions on probationary sentences, sentences of home confinement, and split sentences are also advisory. A sentence of probation will protect Mr. O'Neil, who is particularly vulnerable, from contracting COVID-19.

On March 11, 2020, the World Health Organization ("WHO") officially classified COVID-19, a new strain of coronavirus, as a global pandemic.[8]   As of July 14, 2020, the WHO reported 12,964,809 cases of COVID-19, with deaths totaling 570,288.[9]   The United States has been hit particularly hard by the pandemic.   As of July 14, 2020, the Centers for Disease Control and Prevention ("CDC") reported 3,355,457 confirmed cases of COVID-19 in the United States, and 135,235 related deaths.[10]

One of the populations hit hardest by the pandemic is, unsurprisingly, those incarcerated with the U.S. Bureau of Prisons.   Dr. Caroyln Sufrin, an assistant professor and associate director at the Johns Hopkins University School of Medicine, whose research includes prisons and jails, explains why jails and prisons present high-risk factors for spreading infectious diseases:

> "We have long known that prisons and jails are repositories for the spread of infectious diseases, from tuberculosis to other respiratory infections," she said, "and this coronavirus is even more infectious, so it's no surprise at all." She pointed to several reasons: a lack of space to practice social distancing, inability to follow proper hygiene protocols, contact from the surrounding community and limited containment options. Federal and state prisons alike have seen a surge in cases and deaths that has continued to grow in recent weeks.[11]

Dr. Ross Quin, a physician with thirty years' experience working in prisons, also emphasized the particular dangers the prison environment presents in the midst of a global pandemic:

---

[8] *WHO Director-General's Opening Remarks at the Media Briefing on COVID-19 - 11 March 2020*, WORLD HEALTH ORGANIZATION (Mar. 11, 2020), https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.

[9] *Coronavirus disease (COVID-19) Situation Report – 176*, WORLD HEALTH ORGANIZATION (July 14, 2020), https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200714-covid-19-sitrep-176.pdf?sfvrsn=d01ce263_2.

[10] *COVID-19: Cases in the U.S.*, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (July 14, 2020).

[11] *How U.S. Prisons Became Ground Zero for Covid-19*, POLITICO (June 25, 2020), https://www .politico.com/news/magazine/2020/06/25/criminal-justice-prison-conditions-coronavirus-in-prisons-338022.

Prisons are petri dishes for contagious respiratory illnesses. We who work inside them will inevitably be exposed, probably repeatedly, and are very likely to become ill with COVID-19.

We may stop visitors from bringing the coronavirus into prison, but there is no way to stop the daily flow of guards, teachers, food service and healthcare workers. Someone is certain to bring the virus in and take it back out while they are asymptomatic.

. . . [S]ocial distancing is impossible in prison, where inmates live two or sometimes three in a cell and work communally every day.

More difficult is the fact we just do not have sufficient protective equipment for our healthcare workers, nor do we have sufficient medical resources to care for those who will become seriously or critically ill. Those inmates will need care in community hospitals.

Prisons are among the most densely packed places on Earth, which promotes any epidemic. There is no way to seal prisons off from society at large, nor is there any way to seal off our society from the stark conditions likely to develop in our prisons.[12]

Currently, the United States' top five COVID-19 "hot spots are all correctional facilities."[13]   Indeed, the "number of infected inmates and workers has topped 70,000 — the count doubled between mid-May and mid-June — and there have been at least 627 virus-related deaths."[14]   Recent testing efforts have shown that "[m]ore than 35% of federal inmates who have tested for coronavirus were positive, according to data from The Bureau of Prisons."[15]

---

[12] Ross Quin, MD, *Letters to the Editor: A prison doctor's stark warning on coronavirus, jails and prisons*, The Los Angeles Times (Mar. 20, 2020), https://www.latimes.com/california/story/2020-03-20/prison-doctors-stark-warning-on-coronavirus-and-incarceration.

[13] *The Coronavirus Crisis Inside Prisons Won't Stay Behind Bars*, THE NEW YORK TIMES (June 25, 2020), https://www.nytimes.com/2020/06/25/opinion/coronavirus-prisons-compassionate-release.html.

[14] *Id.*

[15] *More than 1 out of 3 tested federal inmates were positive for coronavirus*, ABC NEWS (June 16, 2020), https://abcnews.go.com/Politics/tested-federal-inmates-positive-coronavirus/story?id=71275461.

The below charts released by the Federal Defenders of New York, which are updated daily with data from the Bureau of Prisons ("BOP"), show the rapid spread of COVID-19 through BOP facilities nationwide, as well as the disproportionate amount of positive COVID-19 test results among the BOP inmate population, as compared to the populations of the United States, China, and Italy.[16]  The first chart demonstrates that positive test results have, once again, begun to increase, despite peaking in May 2020.  This chart also makes clear that the number of COVID-19 cases and inmate deaths in BOP facilities only continues to rise.



---

[16] FEDERAL DEFENDERS OF NEW YORK (July 14, 2020), https://federaldefendersny.org/.



Also according to Dr. Sufrin, incarcerated individuals "are absolutely at higher risk of severe complications from Covid . . . and that is because so many incarcerated people already have chronic conditions that put them in these high-risk categories of developing more severe disease."[17]  Indeed, "[p]eople with chronic illnesses . . . or that take mediations that suppress the immune system, are all thought to be 'most susceptible to serious complications' of Covid-19, according to the Cleveland Clinic."[18]

The United States Office of the Attorney General has recognized the severe threat that COVID-19 poses to inmates particularly susceptible to infection.  On March 26, 2020, U.S. Attorney General William Barr published a memorandum directing the Bureau of Prisons to transfer vulnerable inmates to home confinement, when removing the inmate from a BOP facility

---

[17] *How U.S. Prisons Became Ground Zero for Covid-19*, POLITICO (June 25, 2020), https://www   .politico.com/news/magazine/2020/06/25/criminal-justice-prison-conditions-coronavirus-in-prisons-338022.

[18] *Id.*

"might be more effective in protecting their health."[19]   Only eight days later, Attorney General

Barr published a second memorandum, directing the Bureau of Prisons to increase its efforts to

transfer vulnerable inmates to home confinement, due to "significant levels of infection at

several of our facilities."[20]   As discussed above, the number of COVID-19 cases within BOP

facilities has only increased and become more widespread since the publication of these

directives.

Mr. O'Neil was diagnosed with psoriatic arthritis in 2012.   *See* Exhibit 3 (Letter from

Stuart Bell, MD).   They Mayo Clinic classifies psoriatic arthritis as a "chronic disease."[21]   Mr.

O'Neil's physician, Stuart B. Bell, MD, Vice President of Medical Affairs at MedStar Good

Samaritan Hospital, explains that Mr. O'Neil is "currently prescribed, among other medications,

Cosentyx" for his arthritis.   *See* Exhibit 3 (Letter from Stuart Bell, MD).   Cosentyx is a "disease-

modifying anti-rheumatic drug ('DMARD'), and it is effective and essential in the treatment of

Mr. O'Neil's condition."   *Id.*   DMARDs are "immunosuppressive medications that are used to

treat the pain and swelling of the arthritis."[22]   Dr. Bell reaches the following conclusions

regarding Mr. O'Neil's health:

> Based on my education, training and research, it is my opinion that patients on
> DMARDs are at a higher risk of contracting infections, including COVID-19.
> Given this, I strongly recommend that Mr. O'Neil not be placed among a
> population with a greater risk of contracting COVID-19.   Finally, it has been

---

[19] *Memorandum for Director of Bureau of Prisons*, OFFICE OF THE ATTORNEY GENERAL (March 26, 2020), https://www.bop.gov/resources/news/pdfs/20200405_covid-19_home_confinement.pdf.

[20] *Memorandum for Director of Bureau of Prisons*, OFFICE OF THE ATTORNEY GENERAL (Apr. 3, 2020), https://www.bop.gov/coronavirus/docs/bop_memo_home_confinement_april3.pdf.

[21] *Psoriatic arthritis*, THE MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/psoriatic-arthritis/symptoms-causes/syc-20354076.

[22] *Treating Lupus with Immunosuppressive Medications*, JOHNS HOPKINS LUPUS CENTER, https://www.hopkinslupus.org/lupus-treatment/lupus-medications/immunosuppressive-medications/.

well-reported and documented by the CDC that inmates in the Bureau of Prisons
face a greater risk of contracting COVID-19.

*See* Exhibit 3 (Letter from Stuart Bell, MD).  Mr. O'Neil, therefore falls into two of the high-risk

categories for contracting COVID-19 – he has a chronic illness and he takes medications that

suppress his immune system.  Any sentence that includes a period of incarceration, therefore,

would place Mr. O'Neil at a higher risk of contracting COVID-19 during the ongoing pandemic.

Given this, and in light of the § 3553 factors discussed above, a sentence of probation is

sufficient, but not greater than necessary, to serve the purposes of the SRA, and will also protect

Mr. O'Neil from contracting a deadly disease.

### E.      The Need to Avoid Unwarranted Sentencing Disparities Counsels in Favor of a Sentence of Probation.

Section 3553(a)(6) directs sentencing judges to consider "the need to avoid unwarranted

sentence disparities among defendants with similar records who have been found guilty of

similar conduct."  Two of the other individuals charged in cases related to Mr. O'Neil's – Kelley

Rogers and Scott Mackenzie – have received sentences significantly below their respective

guidelines.  Given this, a sentence of probation in this case is appropriate and necessary to avoid

unwarranted sentencing disparities.

On September 17, 2019, Kelley Rogers entered into a written plea agreement, wherein he

agreed to plead guilty to a single-count criminal Information charging him with one count of

Wire Fraud, in violation of 18 U.S.C. § 1343.  *See United States v. Kelley Rogers*, Case No. 19-

cr-270-LO, at ECF 7.  Mr. Rogers admitted to "knowingly devis[ing] and intend[ing] to devise a

scheme and artifice to defraud and to obtain money by means of materially false and fraudulent

pretenses, representations, and promises," by "solicit[ing] contributions from the general public

for [his] PACs based on materially false and fraudulent pretenses, representations, and promises" from August 2012 through November 2014.  *Id.* at ECF 8, at ¶¶ 1, 4.

Under the terms of his plea agreement, Mr. Rogers' base offense level was 7.  *Id.* at ECF 7, at 3.  After upward adjustments under USSG §§ 2B1.1 and 3B1.1, and a downward adjustment for acceptance of responsibility under § 3E1.1, Mr. Rogers' total offense level was calculated as a level 28. Id. at ECF 19, at 15.  Mr. Rogers' guidelines range, therefore, was 78 to 97 months. *Id.* The government requested a sentence of 78 months, which it emphasized was at the "low end of the applicable United States Sentencing Guidelines range."  *Id.* at 1.

On January 17, 2020, Mr. Rogers was sentenced to 36 months incarceration, and 3 years supervised release.  *Id.* at ECF 22.  Prior to sentencing Mr. Rogers, the Court decreased his total offense level to a level 26, applying only a 2-level, not a 4-level increase under § 3B1.1(a).  *See* Jan. 17, 2020 Sentencing Tr., at 14:25-15:9.  Mr. Rogers' sentence of 36 months, therefore, represented a 8-level departure from the USPO's guidelines calculation – from a level 28 (a guidelines range of 78 to 97 months) to a level 20 (a guidelines range of 33 to 41 months), and a 6-level departure from the Court's adjusted guidelines calculation – from a level 26 (a guidelines range of 63 to 78 months) to a level 20 (a guidelines range of 33 to 41 months).  The Court, therefore, departed from a requested sentence of 78 months, which was at the low end of the USPO's calculated guidelines range for a total offense level of 28, to a sentence within the guidelines range for a total offense level of 20.

On October 22, 2019, Scott Mackenzie entered into a written plea agreement, wherein he agreed to plead guilty to a single-count criminal Information charging him with one count of False Statements, in violation of 18 U.S.C. § 1001.  *See United States v. Scott Mackenzie*, Case No. 19-cr-309-LO, at ECF 5.  Mr. Mackenzie admitted to "knowingly and willfully caus[ing] the

submission of a number of materially false, fictitious and fraudulent statements and representations . . . to wit, the filing of false reports with the Federal Election Commission ("FEC") on behalf of Political Action Committees ("PACs"), namely Conservative StrikeForce and Conservative Majority Fund" from 2011 through 2018. *Id.* at ECF 6, at ¶ 1.

Under the terms of his plea agreement, Mr. Mackenzie's base offense level was 6. *Id.* at ECF 5, at 3. After upward adjustments under USSG §§ 2B1.1 and 3B1.3, and a downward adjustment for acceptance of responsibility under § 3E1.1, Mr. Mackenzie's total offense level was calculated as a level 19. *Id.* at ECF 15, at 10-12. Mr. Mackenzie's guidelines range, therefore, was 30 to 37 months. *Id.* The government requested a sentence of 30 months, which it emphasized was at the "low end of the guidelines." *Id.* at 10.

On February 21, 2020, Mr. Mackenzie was sentenced to 12 months and one day incarceration, and 2 years supervised release. *See id.* at ECF 20. This sentence represented a <u>6-level departure</u> – from a level 19 (a guidelines range 30-37 months) to a level 13 (a guidelines range of 12-18 months). The Court, therefore, departed from the government's requested sentence of 30 months, which was a the low end of the adjusted guidelines range for a total offense level of 19, to a sentence at the low end of the guidelines for a total offense level of 13.

Also relevant to the Court's determination of Mr. O'Neil's sentence are the varying base offense levels for Mr. Rogers, Mr. Mackenzie, and Mr. O'Neil. Indeed, although Mr. Rogers, Mr. Mackenzie, and Mr. O'Neil were all charged with conduct stemming from fraudulent campaign contributions, they were each presented with plea agreements that included different base offense levels. Mr. Mackenzie began with a base offense level of 6, Mr. Rogers began with a base offense level of 7, and Mr. O'Neil began with a base offense level of 8. *See United States v. Scott Mackenzie*, Case No. Case No. 19-cr-309-LO, at ECF 5; *United States v. Kelley Rogers*,

Case No. 19-cr-270-LO, at ECF 7; and *United States v. Charles O'Neil*, Case No. 20-cr-10-LO, at ECF 7.  Given the choice of accepting a plea offer from the government that placed him at a higher base offense level than Mr. Rogers and Mr. Mackenzie, or going to trial, Mr. O'Neil made the choice to accept responsibility, and the stringent plea offer from the government.

According to the USPO, Mr. O'Neil's total offense level is 13, with a Criminal History Category I.  *See* PSR, at ¶ 87.  Taking into account Mr. O'Neil's enhanced base offense level, and the sentencing departures granted to Mr. Rogers and Mr. Mackenzie, a 6 to 8-level departure is warranted.  Such a departure would result in a total offense level of 5 to 7, and a guidelines range of 0 to 6 months.  A sentence of probation is at the low end of this adjusted guidelines range, which is consistent with the sentences imposed upon Mr. Rogers and Mr. Mackenzie.

Mr. O'Neil's conduct, while very serious, is far less egregious than the crimes committed by Mr. Rogers and Mr. Mackenzie.  Both Mr. Rogers and Mr. Mackenzie received sentences that constituted a significant downward departure from a guidelines sentence – a downward departure of six to eight levels for Mr. Rogers and a downward departure of six levels for Mr. Mackenzie.  Given these below-guidelines sentences for Mr. Rogers and Mr. Mackenzie, a sentence of probation for Mr. O'Neil would be appropriate, just, and necessary to avoid unwarranted sentencing disparities.  *See United States v. Clark*, 434 F.3d 684, 685 (4th Cir. 2006).

### F.  The Need to Provide Restitution to Any Victims of the Offense.

Section 3553(a)(7) directs sentencing judges to consider "the need to provide restitution to any victims of the offense."  Victim means "any person directly harmed by the defendant's criminal conduct in the course of the scheme . . . ."  18 U.S.C. § 3663A(a)(2).  Restitution was rightly not included in Mr. O'Neil's plea agreement.  Furthermore, the USPO stated in Mr. O'Neil's PSR that restitution was "not applicable" in this matter.  *See* PSR at ¶ 87.

IV.      **FINANCIAL INABILITY TO PAY A FINE.**

The recommended range for a fine in this case is $3,000 to $30,000.  PSR at ¶ 87.  "[T]he Probation Office defers to the Court on whether a fine should be imposed in this case."  PSR at 19.  Mr. O'Neil has retirement savings, but he also a negative cash flow each month.  *Id.*  Due to the uncertainty of future advancement or other employment opportunities, we respectfully submit that no fine should be imposed.  Mr. O'Neil could liquidate his retirement accounts, but he would incur taxes and penalties to do so.  Finally, Mr. O'Neil has incurred significant legal fees over a period of two years.

## V.     <u>CONCLUSION</u>

The Sentencing Reform Act provides a list of goals for sentencing judges to consider when imposing a sentence, including (1) promoting respect for the law, (2) providing just punishment for the offense given the circumstances, (3) affording adequate deterrence for criminal conduct, (4) protecting the public, and (5) providing Mr. O'Neil with reasonable rehabilitative services.

The stigma of a felony conviction promotes respect for the law, and it will dissuade others from committing similar crimes.  There is no danger that Mr. O'Neil will offend again. He poses no harm to the public.   A sentence of probation will achieve the above-listed objectives.

Respectfully submitted,


      /s/ Steven J. McCool, Esq.
STEVEN J. McCOOL
Virginia Bar No. 89860
McCOOL LAW PLLC
1776 K Street, N.W., Suite 200
Washington, D.C. 20006
Telephone:  (202) 450-3370
Fax:  (202) 450-3346
smccool@mccoollawpllc.com

*Counsel for Charles O'Neil*

## CERTIFICATE OF SERVICE

I hereby certify that on the 16th day of July 2020, the foregoing was served upon counsel of record by CM/ECF electronic filing.

    /s/ Steven J. McCool, Esq.
STEVEN J. McCOOL
Virginia Bar No. 89860
McCOOL LAW PLLC
1776 K Street, N.W., Suite 200
Washington, D.C. 20006
Telephone:  (202) 450-3370
Fax:  (202) 450-3346
smccool@mccoollawpllc.com

*Counsel for Charles O'Neil*